IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| LOUIS VUITTON MALLETIER | § | |
|    Plaintiff, | § | CIVL ACTION |
| | § | |
| v. | § | SA-11-CV-00124-HLH |
| | § | |
| EISENHAUER ROAD FLEA MARKET, | § | |
| INC., BRUCE L. GORE, AND PATRICIA | § | |
| D. WALKER, | § | |
|    Defendants. | § | |

## APPENDIX - DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## FACTS

1. The Eisenhauer Road Flea Market is an indoor, air-conditioned flea market in San Antonio, Texas with approximately 250 rental spaces where tenants, on a month to month lease, offer all types of merchandise for sale to the general public.

2. Bruce L. Gore is the sole shareholder and President of Eisenhauer Road Flea Market, Inc. **Exhibit A**, Deposition of Bruce L. Gore, October 20, 2011, at 9:11 – 10:1. Mr. Gore purchased stock in the Eisenhauer Road Flea Market, Inc. in December 2005.

3. Patricia D. Walker is the Secretary and manager of Eisenhauer Road Flea Market, Inc. **Exhibit A**, at 10:5 – 17. Ms. Walker has worked at the Market for approximately 25 years.

4. Tenants lease space from the Market on a monthly basis without a specified term. **Exhibit F**. Rent is approximately based on the square footage of the space or room, which is generally $1.50 per square foot. **Exhibit B**, Deposition of Patricia D. Walker, October 21, 2011, at 25:6-9. Rent does not change depending on the volume of goods the tenant's sell. **Exhibit A**, at 40:6 - 14. The Market, similar to a traditional shopping mall, operates a concession stand, provides air conditioning for tenants and customers, electricity, restroom facilities, parking lot,

and off-duty Bexar County Sherriff Deputies as security on the weekends. **Exhibit A**, at 207:18 - 208:1. Defendants do not provide any products or services relating to counterfeiting Louis Vuitton items.

5.     Plaintiff Louis Vuitton Malletier, a French manufacturer, filed this lawsuit alleging that some of the tenants at the Market sold, among other merchandise, a small number of goods bearing counterfeit Louis Vuitton trademarks. Plaintiff did not sue any of the tenants alleged to have directly infringed Louis Vuitton's trademarks, nor did it sue any manufacturer, supplier or distributor. **Exhibit C**, Deposition of Kenneth C. Klug, October 26, 2011, at 58:18 – 20. Louis Vuitton has consciously chose not sue any direct counterfeiters in this case, in part, because they do not have any money. **Exhibit C**, at 73:21 – 74:1.

6.     Plaintiff Louis Vuitton has no evidence, and has not alleged that Mr. Gore or Ms. Walker were in possession or offered for sale counterfeit Louis Vuitton items. **Exhibit C**, at 39:13 – 40:4.

7.     At some point in 2005, Plaintiff Louis Vuitton began investigating tenants operating out of the Market for selling or offering for sale counterfeit Louis Vuitton items. Plaintiff contracted with Investigative Services Corporation (hereinafter "ISC") to investigate and make undercover purchases from some of the over 200 tenants at the Market. During some investigations, ISC investigators would be accompanied by law enforcement. Law enforcement would then conduct a raid on the tenant's space and seize merchandise that was allegedly counterfeit. Louis Vuitton prefers having law enforcement involved in raids or under cover purchases because it is "extremely effective in removing a counterfeiter from a particular location" and assists in proving civil liability cases against flea market. **Exhibit C**, at 64:15 – 67:3. Sometimes the raids occurred outside the Market which included personal homes of tenants or offsite storage spaces.

**Exhibit G; Exhibit C**, at 40:5 – 20.

8.  Louis Vuitton investigators are considered experts in identifying counterfeit merchandise and undergo training. **Exhibit T**; **Exhibit E**, Deposition of Joel Voyles, October 25, 2011, at 22:13 - 25:20. In contrast, Mr. Voyles was never asked, nor conducted any training for Ms. Walker. **Exhibit E**, at 25:21 - 27:3.

9.  Kenneth Klug, the Director of Criminal Enforcement for Louis Vuitton, would review the seized merchandise and apply a lengthy checklist to determine if a seized good was counterfeit or not. **Exhibit H, at ¶ 5.** In one instance, Mr. Klug viewed pictures of a raid and submitted an affidavit swearing the items were counterfeit. **Exhibit I.** Mr. Klug states in his affidavit that he had been employed since July 2005 and underwent "intense training" to become familiar with Louis Vuitton's trademarks and anti-counterfeiting programs. **Exhibit I.**

10. It was standard practice for the police and Louis Vuitton's investigators to not tell Eisenhauer Road Flea Market about any seizures or undercover buys. **Exhibit A**, at 35:13 - 37:5; *see e.g.* **Exhibit D**, Deposition of Stephanie Voyles, October 25, 2011, at 63:17 – 64:2. Additionally, police would often enter the Market from back doors and would not go to the office to notify Ms. Walker about a raid or seizure. **Exhibit B**, Deposition of Patricia D. Walker, October 21, 2011, 13:7-10. On at least one occasion, Ms. Walker approached the individuals conducting the seizure and was told "This is none of your business." **Exhibit B**, Deposition of Patricia D. Walker, October 21, 2011, 12:20 – 13:2; *see also* **Exhibit A**, at 35:13 - 37:10. It was standard practice for Louis Vuitton's investigators to write a report that would not be sent to Defendants for over a year. *See e.g.* **Exhibit J**, dated June 24, 2009, was not produced to Defendants until October 13, 2010, **Exhibit K.**

11. On June 26, 2009, Plaintiff Louis Vuitton, for the first time, provided notice to the

Market concerning the sale of counterfeit Louis Vuitton items in booths 1, 27, 38, 42, and DE. **Exhibit L**. Louis Vuitton did not have any written correspondence to Defendants notifying Defendants about the alleged counterfeiting prior to June 26, 2009. **Exhibit C**, at 105:5 – 11. Plaintiff's letter merely states the accusation that vendors were selling counterfeit goods and failed to include any evidence of the actual sale or offering for sale of counterfeit goods. **Exhibit L**. After receiving this letter, Mr. Gore and Ms. Walker had a meeting or spoke with, all tenants identified in Plaintiff's letter. At that time the tenants were instructed not to sell counterfeit Louis Vuitton items. Mr. Gore and Ms. Walker made an effort to watch some tenants to ensure they were not selling these items. **Exhibit A**, at 68:24 – 72:21.

12. On March 19, 2010, Plaintiff sent a second letter to Patricia Walker generally alleging tenants located in the Market were selling counterfeit Louis Vuitton items. This letter did not identify any tenants, booths, specific dates, or other information and failed to include any actual evidence such as investigative reports. Despite not including any evidence, Louis Vuitton listed a series of "demands" for Defendants to undertake including "immediate eviction of all tenants and vendors at the Market who have previously offered for sale, or are currently offering for sale, items bearing counterfeit Louis Vuitton Trademarks." Additionally, Louis Vuitton ordered (a) the posting of signs stating the sale of counterfeit Louis Vuitton items is prohibited by state and federal law; (b) changing the terms in the tenant lease agreement to strictly prohibit sale of counterfeit goods; (c) requiring the tenant to vacate its lease upon presentment of proof of counterfeit; (d) continuously monitor tenants; (e) perform random unannounced inspections to search for counterfeit Louis Vuitton trademarks; and (f) permit Louis Vuitton to conduct unannounced random inspections at the Market. **Exhibit M.** Despite affirmatively requesting permission to conduct unannounced random inspections at the Market, Louis Vuitton had

already been conducting random and unannounced inspections for some time prior to the letter. **Exhibit C**, at 126:3 – 17.

   13.   Although the Market did not formally respond to Plaintiff's March 19, 2010, letter as it had done regarding the June 26, 2009 letter, the Market took several proactive actions, in good faith, because it did not want tenants conducting illegal activities.  As such, the Market required purse vendors to sign an agreement to not sell counterfeit Louis Vuitton items.  **Exhibit N; Exhibit O**.  Defendants put up signs at the Market warning tenants and vendors that the sale of counterfeit Louis Vuitton items were prohibited.  **Exhibit A**, at 82:1 – 83:25.  Defendants would conduct unannounced random inspections concerning the sale of counterfeit Louis Vuitton items; inspecting various tenants two to three times a month but did not see any Louis Vuitton items on display.  **Exhibit A**, at 16:24 – 17:11; 86:5 – 11; **Exhibit B**, at 48:16 – 49:1.  Defendant Walker also modified the standard lease agreement to expressly prohibit the sale of counterfeit goods.  **Exhibit B**, at 42:5 – 42:19.  Defendants evicted five tenants who were alleged to have sold counterfeit goods.  **Exhibit B**, at 32:4 – 23; **Exhibit P.**  Mr. Gore provided tenants with a second chance based on tenant's insistence they would not sell counterfeit goods, and as a result, the Market may not have evicted the tenants as quickly as Louis Vuitton wanted.  **Exhibit A**, at 109:4 – 110:18.

   14.   On numerous occasions, Defendant Walker and Gore spoke to the alleged vendors and the vendors specifically stated they would not sell counterfeit items anymore.  **Exhibit A**, at 15:7 – 16:23; 39:16 – 40:14; 63:23 – 64:20; **Exhibit B**, at 32:24 - 33:16.

   15.   On August 5, 2010, the Market's corporate counsel David "Clay" Snell responded to Plaintiff, after receiving another letter from Plaintiff, and disclosed several of the items the Market had done in response to Plaintiff's March 19, 2010 demand letter.  Attached to the letter,

were the agreements the Market obtained from purse tenants indicating the tenants agreed to not sell counterfeit Louis Vuitton.  As part of the letter, Mr. Snell requested Louis Vuitton immediately notify him of any tenant allegedly selling or offering for sale counterfeit Louis Vuitton items.  **Exhibit Q; Exhibit N; Exhibit O.**  Despite the good faith efforts Defendants were utilizing to accommodate Plaintiff's demands, Plaintiff responded on September 3, 2010 stating it was "too little too late" and threatening a lawsuit for a seven or eight figure statutory damage award.  **Exhibit R.**

16.  Many, if not all, the actions of Defendants were completed, or in process, prior to Louis Vuitton sending any form of evidence regarding counterfeit goods.  It wasn't until October 13, 2010 that Plaintiff Louis Vuitton sent a letter to Defendants with *specific proof* of alleged counterfeit sales by vendors located in the Market.  However, the letter, and attached investigative reports, did not include any police reports, convictions, guilty pleas, or affidavits asserting to the truthfulness and credibility of the reports.  **Exhibit K.**

17.  Plaintiff filed the instant lawsuit on February 11, 2011.